**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | |
|---|---|
| **RICARDO MCCLINTON and DORIS JONES, Individually and as Administrators of the Estate of JAMARI MCCLINTON,** ) ) ) ) ) | |
| **Plaintiff,** ) ) | |
| **v.** ) ) | **CIVIL ACTION NO. 5:22-cv-109 (MTT)** |
| **Warden WALTER BERRY, et al.,** ) ) | |
| **Defendants.** ) ) | |

## ORDER

The plaintiffs Ricardo McClinton and Doris Jones, individually and as administrators of the estate of Jamari McClinton, filed this 42 U.S.C. § 1983 action against Warden James Perry, Eladio Abreu, Jarvis Primus, Lieutenant Nolita Moss, and Warden Walter Berry, all in their individual capacities.  Doc. 31.  The plaintiffs claim that the defendants violated the Eighth and Fourteenth Amendments by failing to protect Jamari from an inmate assault that resulted in his death.  *Id.*  The defendants have moved for summary judgment.  Doc. 46.  For the following reasons, the defendants' motion for summary judgment (Doc. 46) is **GRANTED.**[1]

---

[1] Accordingly, the defendants' motion to exclude the testimony and opinions of Louis Eichenlaub (Doc. 47) is **DENIED** as moot.

# I.  BACKGROUND[2]

The plaintiffs are the parents of Jamari McClinton, who was fatally stabbed on August 11, 2021, at Baldwin State Prison ("Baldwin") shortly after his transfer from Phillips State Prison ("Phillips").  Doc. 31 ¶¶ 5, 17, 27.

At all relevant times, the defendants held the following positions.  Perry was the warden at Phillips and was responsible for its day-to-day operations.  Docs. 46-2 ¶ 2; 52-4 ¶ 2.  Abreu was a classification analyst in the Georgia Department of Corrections' ("GDC") central office who approved Jamari's transfer from Phillips to Baldwin.  Docs. 46-2 ¶ 3; 52-4 ¶ 3.  Primus was a counselor at Baldwin who conducted an intake interview with Jamari.  Docs. 46-2 ¶¶ 4, 29; 52-4 ¶¶ 4, 29.  Moss was a shift supervisor at Baldwin who spoke with Jamari either one or two days before his death.  Docs. 46-2 ¶¶ 5, 42; 52-4 ¶¶ 5, 42.  Berry was the warden at Baldwin.  Doc. 46-7 ¶ 2.

## A.  Factual Background

Jamari was an inmate at Phillips from May 28, 2020, until his transfer to Baldwin on August 6, 2021.  Docs. 46-2 ¶ 6; 52-4 ¶ 6.  On April 19, 2021, Jamari stabbed Michael Johnson, an inmate at Phillips who was a high-ranking member of the Blood gang.  Docs. 46-2 ¶¶ 7, 9; 52-4 ¶ 7, 9; 60 at 9:25 - 10:1-4.  The plaintiffs contend that Jamari acted in self-defense after Johnson "intervened in an altercation between [Jamari] and another inmate who [Jamari] had reported to staff for sexually assaulting him the day before."  Doc. 52-4 ¶ 7; 46-2 ¶ 7.  After the stabbing, Warden Perry placed Jamari in involuntary protective custody, where he remained for approximately four

---

[2] Unless otherwise stated, these facts are undisputed and are viewed in the light most favorable to the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

months.  Docs. 46-2 ¶ 9; 52-4 ¶ 9; 60 at 10:9-11.  Warden Perry placed Jamari in protective custody[3] to prevent retaliation by Johnson or one of his gang affiliates and to prevent Jamari from attacking Johnson a second time.  Docs. 46-2 ¶ 9; 52-4 ¶ 9; 60 at 13-15.  On August 5, 2021, a deputy warden at Phillips requested a transfer of Jamari to another prison.  Doc. 46-2 ¶¶ 13-14; 52-4 ¶¶ 13-14.  Warden Perry testified that he decided to transfer Jamari because Jamari could not remain in protective custody indefinitely and he could not safely return to general population while Johnson remained at Phillips.[4]  Docs. 46-2 ¶ 10; 52-4 ¶ 10; 60 at 26-28.

Inmate transfers are processed at the GDC Offender Administration Unit by classification analysts like Abreu.  Docs. 46-2 ¶ 13; 46-3 ¶ 11; 52-4 ¶ 13.  Transfer requests are submitted through GDC's SCRIBE[5] software and are processed by category based on the reason for the inmate's transfer.  Doc. 57 at 10-11.  Classification analysts are assigned particular categories and only review transfer requests relating to their assigned category.  Docs. 46-2 ¶ 17; 52-4 ¶ 17; 57 at 20:20-24.  The role of an analyst is to review requests and place an inmate at a facility that can accommodate the stated reason for the transfers.  Docs. 46-2 ¶¶ 13, 17; 52-4 ¶¶ 13, 17; 57 at 10:2-15.

---

[3] Protective custody is the same as segregation which, in common parlance, means solitary confinement.

[4] In their complaint, the plaintiffs alleged that some of the defendants knew of a social media "murder-for-hire" contract placed on Jamari by Johnson.  Doc. 31 ¶ 13, 18.  The plaintiffs relied on those allegations at the motion to dismiss stage.  Doc. 37.  In their response to the defendants' summary judgment motions, the plaintiffs cite no evidence of a murder-for-hire contract and admit that no defendant knew of the alleged contract.  Docs. 46-2 ¶¶ 12, 23, 35, 47, 55; 52-4 ¶¶ 12, 23, 35, 47, 55.

[5] According to the GDC, SCRIBE is the "Statewide Correction Repository & Information system" that allows GDC employees to log inmate information so that it is accessible across GDC facilities.  *See* GDC, *Standard Operating Procedure*s, No. 204.08 ¶ 1, Data Management, https://gdc.georgia.gov/organization/about-gdc/agency-activity/policies-and-procedures/204-policy-facilities-technology (slick on the link labeled "204.08 (11A05-0005) Inmate Use of Computers.")

The request to transfer Jamari was submitted on August 5, 2021, and it listed "MENTAL HEALTH" as the "requested category" and "requested reason" for the transfer.  Docs. 46-2 ¶ 14; 46-4 at 6; 52-4 ¶ 14.  However, the transfer request went on to state,

> PLEASE TRANSFER INMATE MCCLINTON TO A FACILITY WITH MH LEVEL THREE SERVICES. HE CANNOT COME OUT ONTO THE COMPOUND BECAUSE OF A KNOWN ENEMY.  THE ENEMY IS IDENTIFIED AS JOHNSON, MICHAEL…A HIGH RANKING BLOOD MEMBER WHOM INMATE MCCLINTON ASSAULTED WITH A WEAPON.

Docs. 46-2 ¶ 16; 46-4 at 6; 52-4 ¶ 16.  Abreu, who was responsible for all mental health transfers, reviewed the request and approved Jamari's transfer to Baldwin on August 5.  Docs.  46-2 ¶¶ 17, 21; 46-4 ¶¶ 5, 7, 10; 52-4 ¶ 17, 21.  Abreu testified that he approved the transfer request because the request stated that Jamari needed placement in a level III mental health facility, and Baldwin provided those services.  Docs. 46-2 ¶ 21; 46-4 ¶ 10; 52-4 ¶ 22.  Abreu did not know that Jamari had been in protective custody at Phillips.  Docs. 46-2 ¶ 22; 46-4 ¶ 11; 52-4 ¶ 22.  Nor did he have control over Jamari's dormitory assignments at Baldwin.  Docs. 46-2 ¶¶ 19, 25; 52-4 ¶¶ 19, 25.

Jamari was transferred from Phillips to Baldwin on August 6 and placed in general population.  Docs. 46-2 ¶ 26, 28; 52-4 ¶ 26, 28.  On August 9, Jamari's intake counselor, Jarvis Primus, conducted Jamari's intake interview.  Docs. 46-2 ¶ 29; 46-5 ¶¶ 3; 52-4 ¶ 29.  During the interview, Primus spoke with Jamari about the Prison Rape Elimination Act and about Baldwin's mental health services.  Doc. 46-5 at 5.  Jamari did not raise any concerns about his safety during that interview.  Docs. 46-2 ¶ 31; 52-4 ¶ 31.  Primus testified that he did not know that Jamari had been in protective custody at Phillips or that he had been involved in an altercation with a high-

ranking gang member.[6]  Docs. 46-2 ¶¶ 33-34; 46-5 ¶¶ 5-6; 52-4 ¶¶ 33-34.  Primus had

no control over Jamari's housing assignment at Baldwin and had no involvement with

Jamari after the intake interview.  Docs. 46-2 ¶¶ 32, 37; 46-5 ¶¶ 4, 9; 52-4 ¶¶ 32, 37.

On either August 9 or 10, Jamari told corrections officer Krystal Milner that he

needed to leave his dorm at Baldwin because "[he] did something to an offender at

another institution, and [they were] in the same dorm together."[7]  Docs. 46-2 ¶ 28; 52-4

¶ 28; 59 at 7.  Officer Milner told her supervisor, Lieutenant Moss, who directed Officer

Milner to send Jamari to security.  Docs. 46-2 ¶ 41; 59 at 36; 52-4 ¶ 41.  Milner did not

tell Lieutenant Moss that Jamari claimed to be housed with an inmate whom he had

harmed.  Docs. 46-2 ¶ 40; 52-4 ¶ 40.  Lieutenant Moss spoke with Jamari twice.  Docs.

46-2 ¶¶ 42, 44; 46-6 ¶ 3; 52-4 ¶¶ 42, 44; 59 at 18.  During their first conversation,

Jamari did not say why he wanted protective custody.  Docs. 46-2 ¶ 43; 46-6 ¶ 3; 52-4

¶ 43. Lieutenant Moss left Jamari in a holding cell and, when she returned, Jamari told

Lieutenant Moss that he no longer wanted protective custody and asked to go back to

his assigned dorm.  Docs. 46-2 ¶ 44; 46-6 ¶ 3; 52-4 ¶ 44.

Jamari returned to his dorm around 6:00 p.m. and spoke with Officer Milner.

Docs. 46-2 ¶ 49; 52-4 ¶ 49.  According to Officer Milner, Jamari told her that he decided

to come back to the dorm and that "he was going to be okay."[8]  *Id.*  On August 11,

Jamari was stabbed and killed by an inmate while walking from his dorm to the dining

---

[6] The plaintiff denies this assertion to the extent it implies that information about Jamari's reason for transfer was not available to Primus through Jamari's transfer documentation.  Doc. 52-4 ¶¶ 33-34.

[7] Michael Johnson, the gang leader Jamari stabbed, was not at Baldwin and the record is silent on who Jamari was talking about.

[8] The Court recognizes that a skeptic could question the self-serving accounts of the now-dead Jamari's about-face.  But when the facts are undisputed, skepticism has no role.

hall.  Doc. 46-2 ¶ 50; 52-4 ¶ 50.  According to an incident report, Jamari's assailant was a Blood.  Doc. 46-7 at 8.

**B. Procedural History**

The plaintiffs filed their original complaint on March 14, 2022.  Doc. 1.  In that complaint, the plaintiffs asserted only a wrongful death claim against Primus and Warden Berry for their alleged failure to protect Jamari.  *Id.* at 1.  On April 8, 2024, the Court granted the plaintiffs' motion to amend their original complaint, and the plaintiffs joined defendants Warden Perry, Classification Analyst Abreu, and Lieutenant Moss. Doc. 31.  Because the plaintiffs, by then, had been appointed administrators of Jamari's estate, their amended complaint also asserted a claim on behalf of the estate against all defendants for Jamari's pain and suffering, medical expenses, and funeral expenses. *Id.* ¶¶ 8D, 32.

On June 6, 2024, the new defendants moved to dismiss Jamari's claims, arguing that the plaintiffs' wrongful death claim against them was untimely and that the plaintiffs otherwise failed to state a claim.  Doc. 36.  The Court ruled that the wrongful death claim, but not the estate's claim, against the newly added defendants was untimely because it was asserted after the two-year statute of limitations had run.  Doc. 50 at 21. However, the Court denied the new defendants' motion to dismiss the estate's claim on the merits.  *Id.* at 22.  Thus, the following claims remain: (1) the estate's claim against all defendants, and (2) the plaintiffs' wrongful death claim against original defendants Primus and Warden Berry.

## II.  STANDARD

### A.  Summary Judgment

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is not genuine unless, based on the evidence presented, "a reasonable jury could return a verdict for the nonmoving party."  *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The movant may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  "When the *nonmoving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim[]' in order to discharge this 'initial responsibility.'"  *Four Parcels of Real Prop.*, 941 F.2d at 1437-38 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  Rather, "the moving party simply may 'show[ ]—that is, point[ ] out to the district court—that there is an absence of evidence to support the nonmoving party's case.'"  *Id.* (quoting *Celotex*, 477 U.S. at 324) (alterations in original).  Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial."  *Id.*

The burden then shifts to the non-moving party, who must rebut the movant's showing "by producing … relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324).  The non-moving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable or is not significantly probative' of a disputed fact."  *Id.* (quoting *Anderson*, 477 U.S. at 249-50).  Further, where a party fails to address another party's assertion of fact as required by Fed. R. Civ. P. 56(c), the Court may consider the fact undisputed for purposes of the motion.  Fed. R. Civ. P. 56(e)(2). However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge …. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at 255.

### B.  Qualified Immunity

The doctrine of qualified immunity "offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "Although qualified immunity provides government officials with a formidable shield, their entitlement to raise that shield is not automatic …. the official bears the initial burden of raising the defense of qualified immunity by proving that he was acting within his authority."  *Est. of Cummings v. Davenport*, 906 F.3d 934, 940 (11th Cir. 2018).  "'Once discretionary authority is established, the burden then shifts to the plaintiff to show that qualified immunity should

not apply.'" *Edwards v. Shanley*, 666 F.3d 1289, 1294 (11th Cir. 2012) (quoting *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1291 (11th Cir. 2009)).  The plaintiffs do not dispute that the defendants were acting within their discretionary authority, so the burden shifts to the plaintiffs.  Doc. 52.

To overcome a qualified immunity defense, the plaintiffs must show there is a genuine issue of material fact that (1) the facts, viewed in their favor, establish a constitutional violation; and (2) the new defendants violated law that was clearly established at the time of the alleged violation.  *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019).  This two-step analysis may be done in whatever order is deemed most appropriate for the case.  *Lewis*, 561 F.3d at 1291 (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

Under the Eighth Amendment, prison officials have a duty to "take reasonable measures to guarantee the safety of the inmates."  *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014); *Farmer v. Brennan*, 511 U.S. 825, 828 (1994) ("A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment.").  To survive summary judgment on their failure-to-protect claims, the plaintiffs must provide sufficient evidence of: (1) a substantial risk of serious harm; (2) deliberate indifference to that risk; and (3) causation.  *Goodman v. Kimbrough*, 718 F.3d 1325, 1331 (11th Cir. 2013); *Bowen v. Warden Baldwin State Prison*, 826 F.3d 1312, 1320 (11th Cir. 2016).

"The first element of an Eighth Amendment claim—a substantial risk of serious harm—is assessed under an objective standard."  *Lane v. Philbin*, 835 F.3d 1302, 1307 (11th Cir. 2016).  To prevail, an inmate must show "conditions that were extreme and

posed an unreasonable risk of serious injury to his future health or safety." *Marbury v. Warden*, 936 F.3d 1227, 1233 (11th Cir. 2019) (quoting *Lane,* 835 F.3d at 1307). Plaintiffs can make this showing by demonstrating either a "general threat" to inmates based on dangerous conditions in the prison or particular area of the prison, or by an individualized risk based on a "specific threat" to the prisoner. *Marbury*, 936 F.3d at 1233, 1235; *see also Purcell ex rel. Est. of Morgan v. Toombs Cnty., Ga.*, 400 F.3d 1313, 1320 (11th Cir. 2005).

To establish the second element—deliberate indifference—a plaintiff must provide evidence that the defendant: (1) "was subjectively aware that the inmate was at risk of serious harm"; (2) "disregarded that risk"; and (3) "acted with 'subjective recklessness as used in the criminal law.'" *Wade v. McDade*, 106 F.4th 1251, 1255 (11th Cir. 2024) (quoting *Farmer*, 511 U.S. at 839). Subjective awareness requires that the defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611, 617 (11th Cir. 2007) (citing *Farmer*, 511 U.S. at 837). The determination of whether a risk has been disregarded is objective: "[T]he [defendant] must have responded to the known risk in an unreasonable manner." *Marbury*, 936 F.3d at 1233; *Wade*, 106 F.4th at 1262. In other words, "a defendant who 'respond[s] reasonably' to a risk, even a known risk, 'cannot be found liable' under the Eighth Amendment." *Wade*, 106 F.4th at 1255 (quoting *Farmer*, 511 U.S. at 837, 844) (alteration in original) (internal citation omitted). To establish that "the defendant acted with 'subjective recklessness as used in the criminal law'" the plaintiff must provide evidence "that the defendant was subjectively aware that his own conduct

put the plaintiff at substantial risk of serious harm."  *Id.* (quoting Farmer, 511 U.S. at 839.

"Finally, the plaintiff must show a 'necessary causal link' between the defendant's failure to act reasonably and the plaintiff's injury."  *Marbury*, 936 F.3d at 1233 (quoting *Rodriguez*, 508 F.3d at 622-23).  This causal connection requires that the defendant "(1) had the means substantially to improve the inmate's safety, (2) knew that the actions he undertook would be insufficient to provide the inmate with reasonable protection from violence, and (3) had other means available to him which he nevertheless disregarded."  *Nelson v. Tompkins*, 89 F.4th 1289, 1298 (11th Cir. 2024) (quoting *Rodriguez*, 508 F.3d at 622).

A right becomes "clearly established" in three ways.  *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005).  First, the plaintiffs can show that a materially similar case has already been decided, consisting of binding precedent by the United States Supreme Court or the Eleventh Circuit.  *Id*.  Second, the plaintiffs can show that a broader clearly established principle should control the novel facts of the particular case—that is, the unconstitutionality of the instant conduct must be apparent by looking to the guiding principles of the previous case, irrespective of the underlying factual situation.  *Id*.  Third, the plaintiffs can show that the conduct is so egregiously unconstitutional that prior case law is unnecessary.  *Id*.

## II.  DISCUSSION

The defendants argue that they are entitled to qualified immunity because the plaintiffs cannot establish an Eighth Amendment violation and, even if they could, the

plaintiffs can cite no clearly established law putting any defendant on notice that his or her conduct was unconstitutional.  Doc. 46-1 at 2.  The Court agrees.

### A. Clearly established law and the impact of *Wade v. McDade*

The Court first addresses the defendants' common argument that the law could not have been clearly established because the Eleventh Circuit's 2024 en banc decision in *Wade v. McDade,* which involved a deliberate indifference to medical needs claim, effectively reset Eighth Amendment deliberate indifference jurisprudence.  Doc. 46-1 at 15-16; *Wade,* 106 F.4th at 1254.  *Wade* reconciled inconsistent precedent regarding the state of mind necessary to support deliberate indifference to medical needs claims. *Wade*, 106 F.4th at 1253-54.  Consistent with the Supreme Court's decision in *Farmer v. Brennan*, the Eleventh Circuit held that a plaintiff must show "subjective recklessness as used in the criminal law" to prove deliberate indifference.  *Id.* at 1262 (quoting *Farmer*, 511 U.S. at 839).

Although *Wade* acknowledged inconsistencies in the Circuit's Eighth Amendment deliberate indifference cases, it is far from certain that *Wade* abrogated all Eighth Amendment deliberate indifference precedent, particularly for failure to protect cases. *Wade's* effect on prior precedent was addressed by Judge Jordan in his concurrence. *Wade,* 106 F.4th at 1265 (Jordan, J., concurring).  Judge Jordan suggested that "courts and attorneys look carefully at prior Eleventh Circuit cases to see if they are consistent with the subjective component of deliberate indifference set out in *Farmer*."  *Id.*  If they are, they should "continue to be cited as binding precedent."  *Id.*  Thus, Judge Jordan argued, a pre-*Wade* case may provide a basis for a clearly established right if its analysis is consistent with the standard in *Wade* and *Farmer*.  *Id.*

However, the dueling concurring and dissenting opinions in *Stalley v. Cumbie*, 124 F.4th 1273, 1289-1322 (11th Cir. 2024) suggest that in deliberate indifference to medical needs cases, reliance on *any* pre-*Wade* Eleventh Circuit authority for clearly established law may be problematic.  Subject to further developments, it would seem that the *Wade* problem for failure to protect cases is not as acute.  *Farmer* involved a failure to protect claim and courts tend to hew more closely to *Farmer* in failure to protect cases.  The Court rejects the defendants' argument that *Wade* abrogated all Eleventh Circuit failure to protect cases.

## B. Warden James Perry

Warden Perry argues that the "[p]laintiffs cannot come close to showing that [he] was actually, subjectively aware that his own conduct caused a substantial risk of serious harm to Jamari."  Doc. 46-1 at 10.  Warden Perry's argument focuses on two of *Wade's* requirements.  More fully stated, Warden Perry argues there is no evidence that he was actually aware of a substantial risk of serious harm to Jamari, and neither is there evidence that he was subjectively aware that his own conduct put Jamari at a substantial risk of serious harm.  Doc. 46-1 at 10.  The Court agrees.

Warden Perry testified that he "did not know and did not believe that [Jamari] would face a substantial risk of harm at another prison."  Doc. 46-3 ¶ 9.  Of course, Warden Perry's denial of knowledge of a risk to Jamari at other prisons is not necessarily determinative.[9]  Here, Warden Perry knew that Jamari faced a substantial

---

[9] "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence… and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842; *see also Wade*, 106 F.4th at 1263 (Jordan, J., concurring) ("Second, a defendant's subjective knowledge need not be established by direct evidence or admissions.  As with knowledge in other areas of the law, subjective awareness of a substantial risk of harm can be proven (or an issue of material fact created) through circumstantial evidence.").

risk of harm at Phillips and he responded to that risk.  Warden Perry knew Jamari was

at risk if housed in general population and thus he kept Jamari in involuntary protective

custody for four months.  Doc. 60 at 9:25-10:4.  Understandably, Jamari could not stay

in solitary confinement indefinitely and, thus, a Phillips deputy warden, presumably at

Warden Perry's instruction, submitted a request to transfer Jamari to another facility.

Docs. 46-3 ¶ 10; 52-4 ¶ 10; 60 at 28:17-24.  Although the transfer was categorized as a

mental health transfer, the request nonetheless stated the reason for the transfer:

> HE CANNOT COME OUT ONTO THE COMPOUND BECAUSE OF A
> KNOWN ENEMY.  THE ENEMY IS IDENTIFIED AS JOHNSON,
> MICHAEL…A HIGH RANKING BLOOD MEMBER WHOM INMATE
> MCCLINTON ASSAULTED WITH A WEAPON.

Docs. 46-2 ¶ 16; 46-4 at 6; 52-4 ¶ 16.

The question, though, is whether Warden Perry knew that Jamari would be at

risk at other prisons.  The plaintiffs point to Warden Perry's acknowledgement that "the

possibility of a threat is going to always be…a possibility" and that here, the possibility

of a threat "increase[d] because it was a high-ranking Blood member."  Doc. 60 at

32:14-18.  But general knowledge of a possibility of an assault at other prisons is not

subjective knowledge of a substantial risk of harm to Jamari.  *See Marbury*, 936 F.3d at

1234 ("In general, a plaintiff must show 'more than a generalized awareness of risk' to

make out a deliberate-indifference claim.").  Perhaps if Warden Perry knew where

Jamari would be sent *and* if he knew that Bloods were active there *and* if he had reason

to believe that Johnson could coordinate with Bloods at that prison, *and* if he knew that

the receiving prison might not act on information in the transfer paperwork detailing the

danger Jamari faced, then perhaps the plaintiffs could plausibly argue that Warden

Perry was subjectively aware of a substantial risk of serious harm to Jamari.  But that

evidence is not in the record.  For example, although reports of gang influence and control of GDC facilities may seem common, the record here does not establish that and there is no evidence that Warden Perry knew that because of gang dominance moving Jamari to another prison put him at a substantial risk of serious harm.

Moreover, there is no evidence that Warden Perry unreasonably disregarded a substantial risk of harm to Jamari that he did know about.  He promptly moved to protect Jamari at Phillips and when it became necessary to transfer Jamari, the transfer request informed the receiving prison, whatever prison that turned out to be, of the reason for transfer.  Docs. 46-2 ¶ 16; 46-4 at 6; 52-4 ¶ 16.  Thus, Warden Perry responded reasonably to the risk that he knew about.[10]  And certainly, there is no evidence that Warden Perry was aware that his own conduct put Jamari at substantial risk of serious harm.  In short, the plaintiffs have not shown an Eighth Amendment violation.

Even if the plaintiffs had evidence suggesting that Warden Perry was deliberately indifferent to a substantial risk of serious harm, they make no effort to meet their burden to cite clearly established law providing Warden Perry, or any other defendant, notice that their conduct violated Jamari's Eighth Amendment rights.  Rather, they argue that qualified immunity "is not an issue on summary judgment" because the Court already held that the defendants were not entitled to qualified immunity when it denied the defendants' motion to dismiss.  Docs. 52 at 6; 50.  That is plainly wrong.  The facts *alleged* then are not the same facts before the Court now.  Doc. 50 at 2.  For example, it is now undisputed that no defendant knew of a plot to murder Jamari, which was the cornerstone of the plaintiffs' complaint.  Doc. 31 ¶ 1; *see Oladeinde v. City of*

---

[10] A defendant who responds reasonably to a known risk is not deliberately indifferent.  *Wade*, 106 F.4th at 1255.

*Birmingham*, 230 F.3d 1275, 1289 (11th Cir. 2000) ("The defendants were not precluded from asserting the qualified immunity defense throughout the proceedings as the facts developed.").  Thus, the plaintiffs have failed to meet their burden to cite clearly established law that would have informed Warden Perry that, on  the facts here, transferring Jamari violated Jamari's constitutional rights.

Accordingly, Warden Perry's motion for summary judgment is **GRANTED**.

**C. Classification Analyst Eladio Abreu**

Abreu, whose sole responsibility was to process Jamari's transfer to a facility with level III mental health services, also argues that he was not actually aware of a substantial risk of serious harm to Jamari and that he was not subjectively aware that his own conduct put Jamari at a substantial risk of serious harm.  Doc. 46-1 at 12.  The Court agrees.

The plaintiffs argue that Abreu knew of a substantial risk to Jamari's safety because of Jamari's transfer request and that he acted with deliberate indifference by not communicating with Baldwin to ensure Jamari was placed in protective custody.  Doc. 52 at 9-10.  As support, the plaintiffs point to Abreu's deposition testimony acknowledging that Johnson could have had gang affiliates at any prison.  Docs. 52 at 8-9; 57 at 34:3-8.  They also point to the opinion of their expert, Dr. Louis Eichenlaub, that Abreu "did not afford [Baldwin] an opportunity to fully assess Mr. McClinton's need for protection from Michael Johnson's associates in the Blood gang."  Doc. 52-1 at 12.

There is no evidence that Abreu knew that gang dominance or any other condition at Baldwin placed Jamari at substantial risk of serious harm.  Abreu testified that he is a mental health analyst, and any concern about gang retaliation was a

"security function."  Docs. 46-4 ¶ 10; 57 at 34:18-22.  Abreu's role, and thus the scope of his knowledge, was limited to locating a prison that could provide level III mental health care.  Docs. 46-2 ¶ 17; 52-4 ¶ 17.  Clearly, there is no evidence that Abreu knew that his conduct—facilitating a mental health transfer—placed Jamari at risk.

Further, the plaintiffs have cited no clearly established law that could have provided Abreu, as a mental health analyst, with notice that he violated Jamari's clearly established rights by approving Jamari's mental health transfer request without communicating with officials at either Baldwin or Phillips about safety concerns.

Accordingly, Abreu's motion for summary judgment is **GRANTED**.

## D. Counselor Jarvis Primus

Primus argues that he was not deliberately indifferent because he had "no knowledge of McClinton's assault on Michael Johnson at [Phillips]," no knowledge that an inmate at Baldwin intended to hurt Jamari, and no control over Jamari's housing assignment.  Doc. 46-1 at 6.  Thus, Primus also argues that he was not actually aware of a substantial risk of serious harm to Jamari and that he was not subjectively aware that his own conduct put Jamari at a substantial risk of serious harm.  The Court agrees.

The plaintiffs admit that Primus did not know about Jamari's fight with Johnson. Docs. 46-2 ¶¶ 33-35; 52-4 ¶¶ 33-35.  They also admit that Jamari did not tell Primus that he was in danger or that he needed protective custody.  Docs. 46-2 ¶ 31; 52-4 ¶ 31. They simply argue that Primus "failed to collect the necessary information required by GDC policy."  Doc. 52 at 10.  In other words, the plaintiffs argue that, according to GDC policy and their expert's opinion, Primus *should* have asked more questions during Jamari's intake interview.  *Id.* at 10-11.  But whether Primus violated GDC policy is not

the question—the deliberate indifference inquiry is whether he knew of a substantial risk of harm to Jamari and acted with deliberate indifference to that risk. *See Goodman,* 718 F.3d at 1325, 1334 ("[T]he fact that the officers deviated from policy or were unreasonable in their actions—even grossly so—does not relieve [the plaintiff] of the burden of showing that the officers were subjectively aware of the risk; in other words, he cannot say, 'Well, they should have known.'").  The plaintiffs have provided no evidence of Primus's knowledge of a substantial risk or reckless disregard of a known risk.

Further, the plaintiffs have cited no clearly established law that could have provided Primus with notice that he violated Jamari's clearly established rights when he failed to ask more questions during Jamari's intake interview.

Accordingly, Primus's motion for summary judgment is **GRANTED**.

## E. Lieutenant Nolita Moss

Lieutenant Moss, who met with Jamari after he requested protective custody at Baldwin, argues that the plaintiffs have not established that she was deliberately indifferent because she had limited information that "could not have provided her with knowledge of a substantial risk" of harm to Jamari.  Doc. 46-1 at 12-13.  The Court agrees.

The plaintiffs admit that Jamari did not tell Lieutenant Moss why he wanted to be in protective custody during their initial discussion.  Doc. 52 at 11-12.  They also admit that Jamari later told Lieutenant Moss that he no longer wanted to be in protective custody.  *Id.* at 12.  However, the plaintiffs argue that according to GDC policy Lieutenant Moss should have obtained a written statement from Jamari or otherwise

documented their conversation, and that her failure to do so caused Jamari's death.  *Id.*  But, again, the plaintiffs must provide evidence that Lieutenant Moss had actual knowledge of a substantial risk of serious harm, not that she violated GDC policy.  *Wade*, 106 F.4th at 1255 (quoting *Farmer*, 511 U.S. at 837).  And it is undisputed that Lieutenant Moss did not know about Jamari's previous altercation with Johnson and that Jamari told Lieutenant Moss he wanted to return to his dorm.  *See Green v. Hooks*, 798 Fed. App'x 411, 423 ("Because [the plaintiff] reiterated that everything was 'okay,' no reasonable jury could conclude that the prison officials 'actually knew of a substantial risk that a fellow inmate would seriously harm her.'" (quoting *Caldwell v. Warden*, 748 F.3d 1090, 1102 (11th Cir. 2014)).  And even if Lieutenant Moss violated GDC policy, that is not evidence that she knew her policy violation placed Jamari at a substantial risk of serious harm.

The plaintiffs also claim that Lieutenant Moss admitted that *she* feared for Jamari's safety.  Doc. 52 at 22.  They base this on a misquote from their expert's report, which actually states that Lieutenant Moss told GDC internal investigators that *Jamari* feared for his safety.  Doc 52-1 at 18 ¶ 69.  Either way, that is not enough.  The plaintiffs do not dispute that Jamari never told Lieutenant Moss *why* he feared for his safety and they do not dispute that Jamari asked to return to his dorm.  Doc. 52 at 11-12.  Jamari's broad statement that he feared for his safety does not demonstrate that Lieutenant Moss had knowledge of a substantial risk of serious harm.  *See Marbury,* 936 F.3d at 1238 ("And because [the plaintiff] has not presented anything else that would bolster the unspecified threat, he has not met the requirement of showing deliberate indifference to a substantial risk of serious harm.").

Further, and again, the plaintiffs have cited no clearly established law that could have provided Lieutenant Moss with notice that she violated Jamari's clearly established rights when she acceded to Jamari's request to return to his dorm.

Accordingly, Lieutenant Moss's motion for summary judgment is **GRANTED**.

## F. Warden Walter Berry

Finally, Warden Berry argues that he had no knowledge of Jamari's transfer to Baldwin and, therefore, "had no knowledge of any risk of harm to [Jamari]." Doc. 46-1 at 13. Not only does the Court agree, the plaintiffs and their expert agree that Warden Berry "knew nothing about [Jamari] or any threat he faced" and that "if any Defendant is entitled to summary judgment it would be Warden Berry." Doc. 52 at 14. Nonetheless, the plaintiffs argue that Warden Berry was deliberately indifferent because he failed to ensure that GDC policy was followed at Baldwin, and that failure was a cause of Jamari's death. *Id.* As with the other defendants who allegedly violated GDC policy, the plaintiffs at most have only demonstrated that Warden Berry may have been negligent.

And, of course, the plaintiffs have cited no clearly established law that could have provided Warden Berry with notice that he violated Jamari's constitutional rights.

Accordingly, Warden Berry's motion for summary judgment is **GRANTED**.

## VI. CONCLUSION

The plaintiffs have not provided evidence that any defendant was deliberately indifferent to a substantial threat of serious harm to Jamari. Nor have they cited clearly established law putting any defendant on notice that their conduct violated Jamari's

Eighth Amendment rights.  Accordingly, the defendants' motion for summary judgment

(Doc. 46) is **GRANTED**.

     **SO ORDERED**, this 13th day of February, 2025.

S/ Marc T. Treadwell<br>
MARC T. TREADWELL, JUDGE<br>
UNITED STATES DISTRICT COURT